JACKSON & S. TRACTION CO. v. GREEN.

(Circuit Court of Appeals, Second Circuit. January 12, 1909.)

No. 128.

STREET RAILROADS (§ 57*)—ACTION ON INTEREST COUPONS—EVIDENCE OF PAYMENT.

Evidence considered, and *held* not to sustain the defense of payment in an action on coupons from street railroad bonds.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 141; Dec. Dig. § 57.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon writ of error from a judgment in favor of defendant in error, who was plaintiff below. The action was brought upon $10,000 of coupons on bonds of the defendant company, and verdict was directed in plaintiff's favor.

Griggs, Baldwin & Pierce (Franklin Pierce, of counsel), for plaintiff in error.

Rumsey, Sheppard & Ingalls (John S. Sheppard, Jr., and Russel R. Vaughn, of counsel), for defendant in error.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The uncontradicted testimony, in connection with the averments of the answer. shows that in the spring of 1901 defendant corporation issued 400 5 per cent. bonds, with coupons attached, and turned them over to one Boland and his associates. Boland had bought the railroad property at receiver's sale and turned it over to defendant. The syndicate consisted of Boland, Cochen, Lewis, McCarthy, Flynn, and another, and the answer admits that they "owned the bonds." They hypothecated the bonds, apparently soon after their issue, with the North American Trust Company as security for a loan of about $300,000 made upon a note signed by three or four members of the syndicate. We do not understand that it is contended that Boland and his associates were not bona fide holders of the bonds, for value, without notice, and before maturity. Certainly the answer and testimony, taken together, fully establish that proposition. Moreover, it is indisputable upon the proof that long before the coupons in question fell due the trust company were bona fide holders for value of bonds and coupons. The plaintiff having at the trial presented and put in evidence these very coupons, then in his possession, was prima facie entitled to recover, and we find no evidence in the record to controvert his ownership of them, nor to show that he was himself a party to any fraud or illegality affecting the bonds or coupons. The answer admitted that payment had been duly demanded. Under these circumstances he was entitled to a verdict, unless some defense to his claim was established.

The only defense set up in the answer is "payment." It is alleged that on October 8, 1901, after the coupons were due and payable, and

still undetached from the bonds, and while bonds and coupons were owned by Boland and his associates, who were also owners of practically all the stock, they agreed with defendant for a valuable consideration that the net earnings of the defendant then on hand, amounting to $33,336.95, should be transferred to the surplus account, and that therefrom there should be an 8 per cent. dividend on the stock, and that said money so paid out as a dividend should also be a payment of the coupons, and said coupons should thereupon become and remain the property of defendant. Of course no such agreement could operate to impair the title of the trust company, which held the coupons as well as the bonds, as collateral, and which was under no obligation to part with coupons, even though interest on the note was paid. The trust company, however, elected to give up the coupons without being paid for them, more than a month after they were due (November 7, 1901), detached them from the bonds, and turned them over to Flynn, who acted for the syndicate, and who had paid interest on the note. It is not unusual to allow a person who has pledged bonds as collateral and who keeps his interest charges paid up to take the coupons as they fall due.

The only testimony offered in support of the defense pleaded in the answer is the following: The minute book of the board of directors showed that at a meeting held October 8, 1901, Boland and two other directors being present, the secretary reported that the net earnings amounted to $33,336.95 up to October 1st, and suggested that this amount be transferred to the surplus account, also a dividend of 8 per cent. on the capital stock be paid out of the surplus, and that Mr. Boland moved that such a disposition be made, which was carried unanimously. The capital stock was 3,000 shares (of which Boland held all but 4), and an 8 per cent. dividend on it would amount to $24,000 only. The secretary testified that the dividend was paid as directed, but that he did not know whether it was turned back by the stockholders for further development purposes. Boland, who was president of the company, being called as a witness, testified:

"We made only this issue of bonds, and it was with the understanding that as long as these bonds had to be hypothecated, that the company was earning its dividends, that the coupons should be cut from time to time as they matured, and that the surplus of the earnings of the road should remain in the company for construction."

This was struck out—it was not responsive to any question—and defendant reserved an exception. Flynn testified that he took the coupons off to secure the payment of the interest on the loan, and that subsequently a new loan on the same collateral was secured from Coler & Co., and the trust company loan taken up. The court excluded certain records of the board of directors touching the issue of the stock and bonds. The resolution directed a delivery of the whole series of bonds to the president, to be used by him in paying off the holders of bonds of a former issue and for the completion of the railway to Michigan Center and Grass Lake. Exception was reserved to the exclusion, but the evidence has manifestly nothing to do with the defense of payment. Boland, when asked if he had a conversation with Flynn about the coupons, said that he had "the only

one he could remember"; but, when it appeared that such conversation antedated, not only the delivery of the bonds, but even the execution of the mortgage, the court quite properly excluded it. He also said that he had "a conversation with reference to what should be done with the coupons" with McCarthy; "nothing further than that they should be cut off." The court refused to allow Boland to testify what he did with the money received from the trust company, and exception was reserved. The court also refused to allow two of the firm of Coler & Co. to testify as to what Flynn and McCarthy said to them in November, 1901, about the coupons, and exception was reserved. It is apparent from the above statement that no evidence was put in or offered which tended to support the averments of payment in the answer.

We find no weight in defendant's contention that the bonds and coupons are nonnegotiable. Moreover, no such defense was pleaded.

The judgment is affirmed.